UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BAYER CROPSCIENCE LP, et al.,       )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )   Case No. 4:13CV2375 CDP
                                    )
TEXANA RICE MILL LTD, et al.,       )
                                    )
                                    )
            Defendants.             )

## <u>**MEMORANDUM AND ORDER**</u>

This interpleader action was brought by Bayer to determine its obligations

with regard to a settlement reached with Texana Rice Mill in another suit.[1]  Bayer

and Texana settled Texana's claims, but Texana's creditors have competing claims

to the settlement funds.  Bayer has paid the settlement funds from that tort case

into this court's registry. After disbursements of certain undisputed amounts, the

sum of $933,697.90 remains before the Court.  Two of the claimants, Stearns Bank

National Association and Amegy Bank National Association, assert claims greater

than the amount of the settlement remaining.  A third claimant, Eagle Lake Rice

Dryer, Inc., asserts a claim for approximately $122,000.

---

[1] *Texana Rice Mill, LTD et al. v. Bayer CropScience LP, et al.*, No. 4:07CV416 CDP.

The material facts are undisputed. Based on the legal arguments presented, I conclude that Amegy has a perfected security interest in a commercial tort claim that is superior to the other claimants' interests. Amegy will be awarded the entirety of the Settlement Payment.

## I.    <u>Background</u>

### I.A.   Procedural History

Texana Rice Mill and Texas Rice, Inc. (collectively, Texana) sued Bayer[2] in state court in November 2006 (the Bayer Suit), and the case was removed to federal court, where it became part of the multi-district litigation in February 2007 under the case number 4:07CV416 CDP. Texana brought five claims against Bayer, including negligence *per se*, negligence, public and private nuisance, and strict liability related to the contamination of the United States rice supply by Bayer's genetically modified rice. Texana's damages included costs to decontaminate its property, plant, and equipment from the Bayer rice; lost profits and unrecovered costs due to the unmarketability of its contaminated rice; lost or diminished value in its plant, equipment, and improvements; lost future profits; increased financing costs; and others.

---

[2] Bayer CropScience LP, Bayer CropScience Holding Inc., Bayer CropScience LLC, Bayer CropScience Inc., Bayer Corporation, Bayer Aventis CropScience USA Holding, Inc. n/k/a Starlink Logistics, Inc., Stoneville Pedigreed Seed Company, Bayer AG, Bayer CropScience NV, Bayer CropScience AG, Bayer CropScience Holding SA, and Bayer CropScience SA.

On November 4, 2011, Eagle Lake Rice Dryer, Inc. filed a motion to intervene in the Bayer Suit, which this court granted on December 5, 2011. The court received notice that the Bayer Suit had settled on September 10, 2012.[3] Sixteen days later, Stearns Bank National Association filed its motion to intervene in the Bayer Suit; that motion remains pending. On December 15, 2012, Amegy Bank National Association filed in the Bayer Suit a Notice of First Priority Security Interest, in which it opposed Eagle Lake's motion to enforce its judgment Turnover Order and Stearns Bank's motion to intervene.

In November 2013, before the Bayer Suit settlement finalized, Bayer filed this interpleader action, naming seven groups of claimants to the Bayer settlement proceeds: the Texana parties, Eagle Lake, Stearns Bank, Amegy, Gulf Rice Milling, Inc., the Genetically Modified Rice Common Benefit Qualified Settlement Fund, and Looper Reed & McGraw, P.C.

Eagle Lake, Amegy, and Stearns Bank each answered the complaint in interpleader and filed a cross-claim asserting a respective right to the settlement payment superior to the others' and to any claim asserted by Gulf Rice. Thereafter, all parties consented to an order authorizing Bayer to pay the settlement payment of $2,137,500 into the custody of the Clerk of Court and discharging

---

[3] This settlement was conditioned upon several occurrences, including entry of an injunction against further suits by parties interested in Texana's recovery against Bayer.

Bayer from further liability with respect to the payment.[4] The parties also consented to two disbursements: $213,750 to the Genetically Modified Rice Common Benefit Qualified Settlement Fund and $990,052.10 to Looper Reed.[5] Of the settlement funds, $933,697.90 remains. This amount is insufficient to satisfy the amounts alleged to be owed to the Claimants.

## I.B.    Asserted Interests in the Funds

Eagle Lake

Eagle Lake was awarded a judgment against Texana in Texas state court on April14, 2011, for $122,145.20 plus costs and interest at 5% per year. That court also issued a Turnover Order on June 24, 2011, ordering Texana to turn over all proceeds realized from the Bayer Suit to satisfy Eagle Lake's judgment.

Eagle Lake was the only party to intervene successfully in the underlying suit. It has filed motions asking that I dismiss or strike the cross-claims of Stearns Bank and Amegy, arguing that they lack standing in the interpleader for failure to intervene in the suit that generated the contested funds.

---

[4] The funds were received on March 26, 2014.

[5] Orders dated February 21, 2014, ECF Nos. 55, 56. Both the Fund and Looper Reed were dismissed from the action. Gulf Rice did not answer the interpleader complaint or file a claim to the interpleaded funds. It has, however, consented to this court's orders requiring the deposit of the settlement payment, the two disbursements, granting Bayer injunctive relief, and the dismissal of three parties from the action.

<u>Amegy</u>

Amegy lent Texana $2 million on February 1, 2006, secured by collateral including Texana's inventory, accounts, equipment, furniture, and fixtures, among others (the "Amegy Loan").[6] Texana defaulted on the Amegy Loan in 2006. On June 8, 2007, Texana and Amegy executed a Forbearance Agreement, wherein Amegy agreed to forbear its collections rights on the Amegy Loan in exchange for a security interest in the Bayer Suit, including any recovery or settlement therefrom (the "Claims Agreement").[7] On June 13, 2007, Amegy perfected its interests from the Claims Agreement by filing a UCC financing statement. As of April 30, 2014, the unpaid principal balance on the Amegy Loan totaled $1,935,749.93.

---

[6] Neither Eagle Lake nor Stearns Bank contests the material facts set forth by Amegy. Instead, Eagle Lake repeats the same legal arguments set forth in its motion to dismiss, to wit: Amegy has no claim based upon its failure to intervene in the Bayer Suit, and Eagle Lake's Turnover Order places it first in line for the disputed funds. *See* ECF Nos. 108, 109. Stearns Bank states that it is "without sufficient knowledge to admit or deny" whether Amegy has perfected a security interest in the Bayer Suit, "and therefore denies the same." *See* ECF No. 107.

Local Rule 7-4.01 requires each memorandum in support of a motion for summary judgment to include a statement of material facts with citations to the record. L.R. 7-4.01(E). Each memorandum in opposition must set forth the material facts as to which a genuine issue exists, including "specific references to portions of the record" upon which the opposing party relies. *Id.* Unless specifically controverted, all matters set forth in the statement of the movant are deemed admitted. *Id.* The Eighth Circuit has held that a district court does not abuse its discretion when it deems admitted those statements of undisputed facts that violate the local rules. *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007).

Neither Eagle Lake nor Stearns Bank has provided any evidence contesting Amegy's statement of material facts regarding the perfection of Amegy's security interest. As a result, those facts will be deemed admitted.

[7] The Agreement Regarding Claims and Proceeds recites the procedural history of the Bayer Suit, including the case name and the MDL case number, but it includes a typographical error in the individual case number. Case No. 4:07CV416, ECF No. 101-2.

Amegy moves for summary judgment, arguing that its perfected security interest in the underlying commercial tort claim gives it priority status as to the settlement funds from that suit.

Stearns Bank

Stearns Bank executed a loan to Texana in the original principal amount of $2.65 million on September 13, 2002.[8] Texana authorized a security agreement describing the loan collateral to include all fixtures, chattel paper, equipment, and general intangibles, excluding inventory and accounts receivable, whether then existing or thereafter acquired. The description also included

> all proceeds . . . from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral, or from that party's insurer, whether due to judgment, settlement or other process.

ECF No. 78-2.

Stearns Bank filed a UCC financing statement describing the collateral with the Texas Secretary of State on September 20, 2002. Stearns Bank filed an amended financing statement that restated the collateral on April 2, 2003, and it filed financing continuation statements on April 9, 2007 and April 20, 2012. ECF No. 78-3.

---

[8] Eagle Lake again disputes only the legal conclusions set forth by Stearns Bank.

After Texana defaulted on its loan, Stearns Bank sued in state court; it obtained a final summary judgment against Texana on January 21, 2010, in the amount of $3,161,405.94 plus attorney's fees and interest.  Stearns Bank foreclosed upon the Deed of Trust and the Stearns Security Agreement on June 1, 2010; three days later, it bought all collateral at the foreclosure sale at the sale price of $268,000.  ECF No. 78-6.  Stearns Bank filed its Application for a Writ of Garnishment against the Bayer Entities in the District Court of Harris County, Texas, on October 4, 2012; the writ was issued three days later and then served on the Bayer entities on October 12 and 15, 2012.

Stearns Bank moves for summary judgment, arguing that its own security interest has priority because it filed a UCC financing statement covering Texana's general intangibles before Amegy filed its UCC statement over the suit.  Amegy and Eagle Lake oppose Stearns Bank's motion on the grounds that an interest in general intangibles cannot cover the settlement of a later-arising commercial tort claim and because Stearns Bank's security interests were discharged when Stearns Bank foreclosed on the interest and bought Texana's collateral at auction.

## II.    Discussion

### II.A.  Eagle Lake's Motions to Dismiss

Eagle Lake has filed two motions to dismiss.  In the first, Eagle Lake alleges that because Amegy has not intervened in the underlying case, it cannot state a claim in this interpleader action.  The second motion to dismiss argues that Stearns Bank cannot state a claim because it has not yet been granted permission to intervene; Eagle Lake also argues that the pending motion to intervene should not be granted because the motion was untimely.  Both motions ask in the alternative that the court strike the cross claims of Amegy and Stearns Bank.

### II.A.1.  Legal Standards

In ruling on a motion to dismiss, the court must view the allegations in the complaint in the light most favorable to Plaintiff.  *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).  The court "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party."  *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (citation omitted). The complaint's factual allegations must be sufficient "to raise a right to relief above the speculative level," however, and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (abrogating the "no set of facts" standard for Fed. R. Civ. P. 12(b)(6) found in

*Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).  Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555 (noting pleading offering only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not do).

## II.A.2.  Analysis

Eagle Lake acknowledges that this interpleader action is "a mechanism by which claims to the proceeds made in [the Bayer Suit] pending before the Court are being adjudicated."  Nonetheless, Eagle Lake argues that neither Stearns Bank nor Amegy Bank has standing in this interpleader action, because neither party has been allowed to intervene in the Bayer Suit.  Eagle Lake provides no authority requiring intervention in a separate lawsuit as a prerequisite to asserting a claim in an interpleader action.

The doctrine of standing requires the federal court to determine whether there exists a "case or controversy" amongst the parties as required by Article III of the Constitution.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Although normally posed between plaintiff and defendant, the relevant question in an interpleader remains whether the party has "'alleged such a personal stake in the

outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." *See id.* at 498–99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). *Cf. California v. Texas*, 457 U.S. 164, 165 (1982) (finding interpleader action satisfies "controversy" requirement where stakeholder and claimant assert inconsistent claims).

The interpleader statute, 28 U.S.C. § 1335, allows a stakeholder to institute an interpleader action by depositing money or property worth $500 or more into the registry of the court, provided that there are two or more "adverse claimants" who "are claiming or may claim to be entitled to such money or property." 28 U.S.C. § 1335(a)(1). The conflicting claims need not have the same origin, but they must be "adverse to and independent of one another." 28 U.S.C. § 1335(b). Once the interpleader funds have been deposited with the district court, the court holds them for whichever party it determines is the rightful owner. *See Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 143 (2d Cir. 1988).

Here, Amegy and Stearns Bank have each presented cross-claims in the interpleader that are adverse to Eagle Lake and to each other, in that they both claim an amount in excess of the settlement payment held in the court's registry. As such, they have standing. *See Underwriters at Lloyd's v. Nichol*s, 363 F.2d 357, 364–65 (8th Cir. 1966); *see also* 7 Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1705 (3d ed. 2001) (providing examples).

Eagle Lake's motions will be denied.[9]

## II.B.  Motions for Summary Judgment

### II.B.1.  Summary Judgment Standard

The standard applicable to summary judgment motions is well settled.

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for

summary judgment if all of the information before the court shows "there is no

genuine issue of material fact and the moving party is entitled to judgment as a

matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The initial

burden is placed on the moving party.  *City of Mt. Pleasant, Ia. v. Associated Elec.

Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of

clearly establishing the non-existence of any genuine issue of fact that is material

to a judgment in its favor).  Once this burden is discharged, if the record shows that

no genuine dispute exists, the burden then shifts to the non-moving party who must

set forth affirmative evidence and specific facts showing there is a genuine dispute

on a material factual issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986).

---

[9] Eagle Lake also raises several arguments related to Stearns Bank's security interests that are common to the arguments raised in the two motions for summary judgment discussed below.

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Herring v. Can. Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Herring*, 207 F.3d at 1029 (quoting *Anderson*, 477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. *See Crossley v. Ga.–Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).

In passing on a motion for summary judgment, the court should not weigh evidence or attempt to determine the truth of a matter. Rather, the court must simply determine whether a genuine issue of material fact exists. *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107 (8th Cir. 2000).

## II.B.2.  <u>Summary Judgment Analysis</u>

In Texas,[10] a creditor can secure its right to repayment of a debt by obtaining

a security interest in property held by its debtor, including commercial tort claims.

*See* Tex. Bus. & Com. Code Ann. § 9.109(12) (West).  Most property can be

secured by a description referencing only its "type," such as general intangibles or

fixtures.  *See* § 9.108(a).  A description by type alone, however, will not secure a

commercial tort claim; the UCC "requires greater specificity of description in order

to prevent debtors from inadvertently encumbering" that property.  § 9.108 cmt. 5

("For example, a description such as 'all tort claims arising out of the explosion of

debtor's factory' would suffice . . . .").

A perfected security interest has priority over an unperfected security

interest in the same collateral.  § 9.322(a)(2).  Conflicting perfected security

interests on the same collateral are accorded priority based upon whichever interest

was first perfected or, if simultaneously perfected, upon whichever secured party

first filed a UCC financing statement covering the collateral.  § 9.322(a)(1) &

cmt. 3.  Proceeds of collateral are generally given the same filing and perfection

dates as the original collateral.  *Id.* at § 9.322(b)(1).  Amongst unperfected security

interests, the first attached or effective security interest has priority.  *Id.* at

_____

[10] The parties agree that the laws of Texas govern the perfection and enforcement of their
respective security interests.

- 13 -

§ 9.322(3). Despite the above order of priorities, a security interest will be subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected. *Id.* at § 9.317(a)(2).

The claimants do not contest that the Bayer Suit constitutes a commercial tort claim, and Amegy has provided uncontroverted summary judgment evidence that it has properly filed and perfected its security interest in the Bayer Suit.[11] Although Stearns Bank argues that Amegy cannot have an interest in the Bayer Suit because it did not give value for its security interest, that argument fails at the outset. Amegy agreed to forebear on its collection rights in exchange for the interest in the Bayer Suit. ECF No. 92-2. An agreement to forebear such rights clearly constitutes value. *See Pers. Jet, Inc. v. Callihan*, 624 F.2d 562, 568 (5th Cir. 1980) (applying pre-revision UCC). Stearns Bank's arguments as to priority require more consideration.[12]

Stearns Bank argues that it first filed and perfected its interest in the Settlement Payment as two different forms of collateral governed by the security agreement and financing statement. First, it argues that the Settlement Payment is an after-acquired "general intangible"; and second, since the suit included claims

---

[11] Stringer Aff. 3 at ¶ 8, ECF No. 101-1; UCC Financing Statement, Exh. F. to Stringer Aff., ECF No. 101-2.

[12] Eagle Lake offers only the same failed arguments as in its motion to dismiss.

for harms to Texana's fixtures and equipment, the payment represents "proceeds" from the loss of that collateral.

### Stearns Bank's Interest in General Intangibles

Texana granted to Stearns Bank an interest in its general intangibles, including those acquired after authentication of the security agreement. Payment intangibles are a subset of general intangibles, "under which the account debtor's principal obligation is a monetary obligation." Tex. Bus. & Com. Code Ann. § 9.102(62) (West). Stearns Bank contends that it has a security interest in the Settlement Payment, because a settled tort action is a "payment intangible" under Texas law. *See* § 9.109 cmt. 15 ("[O]nce a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort.").

Amegy and Eagle Lake cite *In re Zych* for the proposition that "the heightened identification requirement applicable to commercial tort claims survives disposition of the claims and extends to proceeds of a commercial tort claim." 379 B.R. 857, 861 (Bankr. D. Minn. 2007). They argue that because Stearns Bank did not describe the Bayer Suit as required by § 9.108(e), and because the UCC prohibits granting an interest in commercial tort claims not then existing, § 9.204(b), that the interest in the payment intangible is unenforceable.

Stearns Bank argues that the case rejected by *Zych*, *In re Wiersma*, 324 B.R. 92 (B.A.P. 9th Cir. 2005), should control. The *Wiersma* court held that an interest in general intangibles included settled commercial tort claims, regardless of whether the claim itself was described in the security agreement. *Id.* at 107 (citing dictum from *In re Pac./West Commc'ns Group, Inc.*, 301 F.3d 1150, 1152 (9th Cir. 2002)).

Until 2001, commercial tort claims were excluded from coverage under Article 9 of the UCC. The recentness of that change, coupled with the rarity of the collateral, has left a dearth of opinions on the subject matter. *See* Barbara M. Goodstein, *Commercial Tort Claims Come into Focus — Hurdles and Hoops*, 45 No. 2 UCC L.J. Art. 2 (2013). The parties cite to no controlling authority holding whether Stearns Bank can enforce a security interest over a payment intangible arising from a later-occurring and undescribed commercial tort claim. Though I am inclined to agree with the *Zych* court, I ultimately need not reach the issue.

The Settlement Payment is proceeds of the Bayer Suit. Amegy's interest in the Settlement Payment was perfected when its interest in the Bayer Suit itself was perfected. *See* § 9.322(b)(1) ("[T]he time of filing or perfection as to a security interest in collateral is also the time of filing or perfection as to a security interest in proceeds[.]"). Stearns Bank's interest in the payment intangible, being after-acquired collateral, did not perfect until the Bayer Suit settled. *See* § 9.322 cmt. 5

& ex. 4.  As Amegy's interest was the first to perfect, it has priority over the Settlement Payment.  *Cf.* § 9.322 (a)(1), ex. 3.

<u>Stearns Bank's Interest in Proceeds</u>

Stearns Bank next argues that, despite the foregoing analysis, it should still have priority as to the portion of the Settlement Payment that can be attributed to the "proceeds" of its original collateral.  The definition of commercial tort claim provides that "[a] security interest in a tort claim may also exist under [Article 9] if the claim is proceeds of other collateral."  Tex. Bus. & Com. Code Ann. § 9.102 cmt. 5(g) (West).  Proceeds include "to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to the collateral. . . ."  § 9.102(64).

An interest in payment intangibles created by settlement must be distinguished from an interest in the proceeds of original collateral that takes the form of a claim.  An interest in payment intangibles would ostensibly give a right to the entirety of a settlement – at least so far as the settlement principally created a contractual obligation to pay money, as opposed to provide a service.  *See* § 9.102(62), cmt. 5(d).  In contrast, a settled tort claim constitutes proceeds only up to the value of the original collateral.  *See Helms v. Certified Packaging Corp.*, 551 F.3d 675, 678 (7th Cir. 2008) (distinguishing between damages from conversion of collateral and those for lost profits);  *see also In re Ferry Road Props., LLC*, 78

UCC Rep. Serv. 2d 580, No. 11-52170, 2012 WL 3888201 (Bankr. E.D. Tenn. Sept. 7, 2012) ("To the extent that [debtor's] state court action encompasses claims beyond property damage, [creditor] has no lien interest."). In the Bayer Suit, Texana settled claims for damages to its equipment and facilities, as well as for a host of other harms, including lost profits. Thus, to the extent Stearns Bank has any interest in the settlement payment as proceeds, it is limited to the amount that can be attributed to Texana's losses to its fixtures and equipment – Stearns Bank's original collateral.

There is a second distinction in play. In *In re American Cartage*, the First Circuit held that the right *to pursue* a commercial tort claim could not be passed to a secured creditor as proceeds of original collateral; rather, only the *right to recovery* on a commercial tort claim could be proceeds of that collateral. 656 F.3d 82, 88 (1st Cir. 2011) ("[T]he term 'proceeds' refers to the secured creditor's right to value derived from the collateral, not the mere act of attempting to recover that value."). In that case, the lender had a security interest in the bankrupt debtor's equipment, general intangibles, and other property, including such property thereafter acquired and all proceeds thereto. *Id.* at 86. The lender foreclosed on the assets and sold them to a buyer, who re-sold them to City. *Id.* Two years later, City sued a third party as the debtor's successor in interest, alleging that the party had tortiously converted assets prior to the foreclosure sale. *Id.* at 86. The

bankruptcy court authorized the trustee to take over the claim against the third party, reasoning that they were commercial tort claims and as such belonged to the estate. *Id.*[13]

The First Circuit affirmed the bankruptcy court and rejected City's argument that the claim itself was "proceeds" of its collateral. The Court of Appeals acknowledged that the UCC allows a security interest in a tort claim to exist "if the claim is proceeds of other collateral," UCC § 9-102 cmt. 5(g), and that "proceeds" were defined as "claims arising out of the loss . . . or damage to" collateral. *Id.* (quoting Massachusetts's implementation of Section 9-102(a)(64) of the UCC). But the court relied on the comment to Section 9-109 of the UCC, which states that Article 9 "applies to assignments of 'commercial tort claims' . . . as well as to security interests in tort claims that constitute proceeds of other collateral (e.g., *a right to payment* for negligent destruction of the debtor's inventory)." *Id.* at 89 (emphasis in original) (quoting UCC § 9-109 cmt. 15). "Viewed as a whole, Article 9 teaches that when a party has an interest in a commercial tort claim as proceeds, what the secured party has is a right to the recovery, not a right to the claim itself." *Id.*

---

[13] The court first determined that since the security agreement did not specifically describe the commercial tort claim, the claim was not original collateral under the security agreement. *Id.* at 88.

Although the *Cartage* case involves different procedural circumstances than the ones at bar, I find its analysis of the UCC to be instructive. Unlike the rights inhering in commercial tort claims, which are themselves collateral, rights to proceeds in this context extend only to the point of recovery for losses to the original collateral. *Cf. Helms*, 551 F.3d at 678. The UCC clearly distinguishes between "commercial tort claims," a defined class of property afforded additional protections against inadvertent assignment, and "tort claims that constitute proceeds of other collateral." I agree with the *Cartage* court: "An action . . . is not proceeds; only the *end product* of that action – the settlement amount or award – constitutes proceeds. *In re Cartage*, 656 F.3d at 89 (emphasis in original).

Amegy and Eagle Lake both argue that Stearns Bank does not retain any right even to the proceeds of Texana's fixtures and equipment, as described above, because Stearns Bank foreclosed upon its security interests. Again, the relevant timeline is:

- September 2002 – Stearns Bank obtains its security interest in Texana's fixtures, equipment, and proceeds thereof
- November 2006 – Texana sues Bayer
- June 2007 –Amegy perfects its security interest in the Bayer Suit
- January 2010 – Stearns Bank obtains final summary judgment against Texana after Texana defaults on its loan
- June 2010 – Stearns Bank forecloses and buys all existing collateral at public auction
- September 2012 – Parties to Bayer Suit notify court of settlement

A secured party's disposition of collateral after default discharges the security interest under which the disposition is made and all subordinate security interests or subordinate liens. Tex. Bus. & Com. Code Ann. § 9.617(a); § 9.617 cmt. 2 (West) ("[This] discharges the security interest being foreclosed . . . even if the secured party fails to comply with this Article."). Stearns Bank foreclosed after Texana defaulted, and it then bought the existing collateral at auction. Under § 9.617, this discharged Stearns Bank's security interest.[14] In June 2010, when Stearns Bank foreclosed and the disposition occurred, the Bayer Suit had not yet settled. Thus, at that time, Stearns Bank had neither an interest in the Bayer Suit as either a payment intangible, § 9.109 cmt. 15, nor as proceeds. *Cf. In re Cartage*, 656 F.3d at 89.

Amegy remains as the sole holder of a perfected security interest in the Settlement Payment. As such, it has priority over all other unsecured claimants. § 9.322.

In a final argument, Stearns Bank contends that the court should place a constructive trust over the settlement funds. Stearns Bank alleges that Amegy should have known that its security interest in the Bayer Suit violated its own

---

[14] Stearns Bank argues that its security interest should survive the foreclosure because it bought the collateral. However, it provides no authority for this assertion. For example, *Peacock Hospitality, Inc. etc. v. Association Casualty Insurance Co.*, merely states that a mortgagee who is still owed money following foreclosure may maintain a deficiency action against an insurance policy up to the amount owed. 419 S.W.3d 649, 653 (Ct. App. Tex. 2013).

rights as to that property. However, as discussed above, Stearns Bank did not have any superior right to the Bayer Suit at the time Texana gave an interest to Amegy. Moreover, to the extent that Amegy's general interests in the suit as a whole conflict with Stearns Bank's limited interest in the proceeds from any tangible equipment or other property, Stearns Bank voluntarily foreclosed on those latter interests and bought the existing collateral at auction; in so doing, it discharged its secured interests in the Settlement Payment. Under those circumstances, the equities do not support the imposition of a constructive trust.[15]

Accordingly,

**IT IS HEREBY ORDERED** that Eagle Lake Rice Dryer, Inc.'s motions to dismiss [## 66, 72] are DENIED.

**IT IS FURTHER ORDERED** that Stearns Bank National Association's motion for summary judgment [# 75] is DENIED.

**IT IS FURTHER ORDERED** that Amegy National Bank Association's motion for summary judgment [# 99] is GRANTED, and Amegy National Bank

---

[15] Stearns Bank presents numerous arguments in its reply brief that were not argued in its original motion or memorandum in support. Those arguments will not be considered. *See Secure Energy, Inc. v. Coal Synthetics, LLC*, No. 4:08CV1719 JCH, 2010 WL 1692076, at *2 n.2 (E.D. Mo. Apr. 27, 2010).

Association has the exclusive right, title, and interest to the remaining interpleaded funds.

**IT IS FURTHER ORDERED** that Amegy National Bank Association shall, no later than **April 14, 2015**, file a proposed pay-out order for disbursement of the funds deposited into the registry of this Court, plus any interest accrued and less any administrative expenses, which must provide **all** information required by Local Rule 13.04(D)(2), and which must comply with the redaction requirements of Local Rule 2.17.

A separate judgment in accordance with this Memorandum Opinion will be entered this same day.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2015.