UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BAYER CROPSCIENCE LP, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 4:13 CV 2375 CDP |
| | ) |
| TEXANA RICE MILL, LTD., et al., | ) |
| | ) |
| Defendants. | ) |

# **MEMORANDUM OPINION**

Bayer brought this interpleader action to determine its obligations with regard to a settlement reached with Texana Rice Mill in another suit.[1] Bayer and Texana settled Texana's claims in that action (the Bayer Settlement), but Texana's creditors had competing interests in the settlement funds. Bayer therefore paid the funds into this Court's registry. After disbursement of certain undisputed amounts and receipt of a partial refund, the registry now contains the principal sum of $977,269.90, representing the Net Settlement to be disbursed in this action. The two remaining claimants, Stearns Bank National Association and Amegy Bank National Association, each assert claims greater than the Net Settlement.

The matter is before me on remand from the Eighth Circuit Court of Appeals. *Bayer CropScience, LLC v. Stearns Bank Nat'l Ass'n*, 837 F.3d 911 (8th

---

[1] *Texana Rice Mill, Ltd., et al. v. Bayer CropScience LP, et al.*, Case No. 4:07CV416 CDP.

Cir. 2016). On Stearns Bank's appeal of my grant of summary judgment to Amegy Bank, the Eighth Circuit held that Stearns Bank had a continued interest in the Bayer Settlement to the extent the settlement was payment for damage to Stearns Bank's original collateral, regardless of its foreclosure on the collateral. *Id.* at 915. The court of appeals therefore remanded the matter for me to determine what part of the sum in the registry constitutes proceeds of Stearns Bank's original collateral and what part does not. *Id.* at 917.

Upon remand, the issue was tried to the Court in a bench trial. Upon consideration of the evidence and testimony adduced at trial, this Court's own orders and records, and the law, I conclude that 39.78% of the Bayer Settlement – or $765,267.75 – constitutes the proceeds of Stearns Bank's original collateral for which Stearns Bank has a priority interest as payment for damage to the original collateral. Accordingly, Stearns Bank shall recover $765,267.75 of the Net Settlement from the Court's registry. Amegy Bank shall recover the amount of Net Settlement that does not constitute proceeds of Stearns Bank's original collateral, that is, $212,002.15.

My findings of fact and conclusions of law follow.

**Findings of Fact**

In 2006, Texana Rice Mill, Ltd., and Texana Rice, Inc. (collectively, Texana), sued numerous Bayer entities and associated entities (collectively, Bayer)

relating to the spread of Bayer's genetically modified rice into the United States rice supply. Texana asserted several tort claims alleging that Bayer's conduct caused Texana to suffer, *inter alia*, lost profits and damage to its equipment, facilities, and goodwill (the Bayer Suit). Texana and Bayer settled the case in September 2012, whereupon Bayer agreed to pay a total of $2,137,500 in exchange for Texana's agreement to release its claims. Ten percent (10%) of this agreed payment was not considered to be part of any recovery, proceeds, or assets of Texana, however, but instead was to be held back and set aside for common benefit fees and costs under the MDL's Common Benefit Order.[2] Accordingly, the amount of the settlement that represented Texana's damages was $1,923,750 (the Bayer Settlement).

When the Bayer Suit settled, Texana owed separate debts to Stearns Bank and Amegy Bank arising from the following transactions and events:[3]

<u>September 13, 2002</u>—Stearns Bank made a $2.65 million loan to Texana.

This loan was secured, in part, by a Commercial Security Agreement covering:
All Fixtures
All Chattel Paper, Equipment and General Intangibles (EXCLUDING INVENTORY AND ACCOUNTS RECEIVABLE)
[including] all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

---

[2] Case No. 4:13CV2375 CDP, ECF #55, Order entered Feb. 21, 2014.

[3] The following summary is based on the Eighth Circuit's own summary that it provided in its opinion. *See Bayer*, 837 F.3d at 913-14.

-3-

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.
(B) All products and produce of any of the property described in this Collateral section.
(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.
(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.
(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Stearns Bank perfected its security interest by filing a Uniform Commercial Code (UCC) Financing Statement with the Texas Secretary of State.

<u>February 1, 2006</u>—Amegy Bank loaned Texana $2 million. Texana defaulted on the Amegy Bank loan in 2006.

<u>November 8, 2006</u>—Texana brought its state court action against Bayer for the contamination of Texana's inventory and property by the genetically modified rice.

<u>June 8, 2007</u>—Texana executed a written Forbearance Agreement with Amegy Bank. Pursuant to this agreement, Amegy Bank agreed to forbear on certain of its contractual and legal rights, and Texana in return gave Amegy Bank a security interest in its Bayer Suit, a commercial tort claim.

<u>June 13, 2007</u>—Amegy Bank perfected its security interest in the commercial tort claim by filing a UCC Financing Statement of public record.

<u>January 21, 2010</u>—A Texas state court entered final summary judgment against Texana for Texana's default on the Stearns Bank loan.

> June 1, 2010—Stearns Bank foreclosed on its Deed of Trust and security agreement. It later purchased all of the existing collateral sold at the foreclosure sale for $268,000.
>
> September 8, 2012—Bayer and Texana reached a settlement agreement in the Bayer Suit, Case No. 4:07CV416 CDP.
>
> October 5, 2012—Stearns Bank applied for writs of garnishment in Texas state court and served the writs on Bayer.
>
> November 22, 2013—Bayer filed this interpleader action to allow any entities claiming an interest in the Bayer Settlement to assert their claims.

Texana's debts to Stearns Bank and Amegy Bank continue to date, with each totaling an amount that exceeds the Net Settlement that is now in the Court's registry. As of June 30, 2017, the outstanding balance due Stearns Bank was $4,602,618.24, with interest accruing at the rate of $401.08 per day. As of July 18, 2017, the outstanding balance due Amegy Bank was $3,375,357.33, with interest accruing at the rate of $309.18228 per day.[4]

Amegy Bank concedes that if any part of the Bayer Settlement is proceeds of Stearns Bank's collateral arising from damage to Texana's real property or equipment, then Stearns Bank is entitled to recover on its claim for those proceeds. Amegy Bank argues, however, that when the Bayer Suit settled in 2012, Texana was no longer pursuing its claim for physical damage to its property or equipment but instead sought to recover only its lost profits. Amegy Bank contends that the

---

[4] Case No. 4:13CV2375 CDP, ECF #149, Stipulations at paras. 34, 40.

Bayer Settlement therefore encompassed only Texana's claim for lost profits, which is the commercial tort claim in which Amegy Bank has a priority interest. Amegy therefore claims that it is entitled to the entirety of the Net Settlement.

Stearns Bank argues that the Settlement and Release executed in the Bayer Suit included all of Texana's claims against Bayer, including its claim for damage to property and equipment. Stearns Bank contends that it is therefore entitled to recover that part of the Bayer Settlement that is payment for damage to this collateral. Stearns Bank also contends that Texana's lost profits, future contracts, and goodwill likewise constitute damage to its collateral as defined by its security agreement and Deed of Trust, and that it is therefore entitled to recover the proceeds of this collateral as well. Stearns Bank therefore claims that all monies paid under the Bayer Settlement are proceeds of its original collateral, and that it is thus entitled to the entirety of the Net Settlement.

<u>Settlement Agreement and Release</u>

The preamble of the 2012 Settlement Agreement between Bayer and Texana briefly recites the general history regarding the contamination of the commercial rice supply by Bayer GM Rice. The preamble specifically identifies the Bayer Suit and acknowledges that

> in said suit Texana has asserted claims against Bayer arising from Texana's purported damages alleged to have been caused by the presence of Bayer GM Rice in the commercial rice supply, *including without limitation* damages arising from alleged lost profits or

-6-

> margins in connection with Texana's marketing of rice, lost business opportunities, damage to reputation and goodwill, customer claims, the costs of testing seed and/or rice for the presence of Bayer GM Rice and losses resulting from Texana's inability to sell, process, and/or market rice ("Claims"), as are more fully set forth in the pleadings, discovery, and expert reports in the suit[.][5]

Expressing Texana's and Bayer's mutual desire "to fully and finally resolve said suit and any claims that may be asserted against Bayer and that relate to or arise from the Claims[,]"[6] the Agreement recites the specific terms of the settlement, whereupon Bayer agreed to pay a total of $2,137,500 in exchange for Texana's agreement to release Bayer of and from

> any and all claims, demands, causes of action, liabilities, sums of money, damages (including, but not limited to, punitive damages), loss of service, expenses, compensation, costs and losses, of any type, kind, nature, description or character whatsoever, whether based on tort, contract, or other theory of recovery and including claims for contribution and indemnity, whether known or unknown, suspected or unsuspected, whether liquidated or unliquidated, which Texana now has or which may hereafter accrue on account of or in any way growing or arising out of the presence in the United States rice supply of Bayer GM Rice Seed, against any Bayer Released Party or any Additional Released Party (collectively, the "Texana Released Claims").[7]

Status of Texana's Claims at the Time of Settlement

When the Bayer Suit settled, the operative complaint pending at that time

---

[5] Stearns Trial Exh. 19 – Settlement & Release, preamble. (Emphasis added.)

[6] *Id.*

[7] *Id.* – Settlement Agreement & Release at para. 1.

specifically claimed that as a consequence of the contaminated rice supply, "Texana's property, including . . . its plant, equipment, and improvements," was damaged,[8] resulting in "Texana's investment in its plant, equipment and improvements [being] lost or severely diminished in value[.]"[9] As relief, Texana sought actual damages for the injuries alleged in the complaint, exemplary damages, interest, and injunctive relief. In its Rule 26 disclosures, Texana included among its damages the diminution in value of its property, plant, and equipment[10]; and discovery and expert reports adduced in the case addressed the diminished value of these fixed assets.[11] Texana's specific claims alleging damage to its land and improvements survived summary judgment.[12] The pleadings, discovery, and expert reports in the Bayer Suit also addressed Texana's claimed damages arising from lost contracts, profits, and goodwill.

In short, when the Bayer Suit settled in September 2012, Texana's claim for damage to its property, plant, and equipment as well as its claim for damage from

---

[8] Case No. 4:07CV416 CDP, ECF #60, Amd. Compl. at paras. 6, 82.

[9] *Id.* at para. 82.f.

[10] Stearns Trial Exh. 3 – Initial Disclosures at p. 26.

[11] Stearns Trial Exh. 4 – October 2009 Bateman Decl. with appendices; Exh. 5 – Cannon survey, included in app'x B to Bateman Decl.; Exh. 6 – WFA appraisal, referred to in Bateman Decl. at p. 6.

[12] *Compare* Case No. 4:07CV416 CDP, ECF #60, Amd. Compl., *with* Case No. 4:07CV416 CDP, ECF #93, Memo. & Order.

lost contracts, profits, and goodwill remained in the case.

Texana's Damages

*Real Property, Equipment, Machinery*

In this interpleader action, Stearns Bank and Amegy Bank stipulate to the value of Texana's real estate, equipment, business, and assets as of the dates of their respective appraisals. Based on these valuations and the trial testimony of Stearns Bank Vice President David Feriancek, and taking into consideration the 2010 foreclosure sale of this property, the contaminated rice supply caused damage to Texana's property, plant, and equipment in an amount totaling $9,232,000.

*Lost Contracts, Future Profits, Goodwill*

Based on Feriancek's trial testimony and the unrebutted expert reports of Merrill J. Bateman admitted in this action, the contaminated rice supply caused Texana to sustain damage from its lost contracts, future profits, and goodwill in an amount totaling $13,978,010.

*No Other Losses*

Texana sustained no damage to its accounts receivable or inventory. Nor did it incur costs to clean its plant and equipment.

*Total Damages*

With the measured damage to its property, equipment, and machinery, combined with its damage from lost contracts, future profits, and goodwill,

Texana's total damages from Bayer GM Rice equaled $23,210,010.

**Conclusions of Law and Discussion**

The federal interpleader statute, 28 U.S.C. § 1335, provides the Court with subject-matter jurisdiction over this action given that there is diversity of citizenship between two or more adverse claimants to a fund having a value of at least $500. The Court also has general diversity jurisdiction under 28 U.S.C. § 1332, with there being diversity of citizenship between all the Bayer entities and all of the named claimants, and an amount in controversy exceeding $75,000. *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530 (1967); *Federated Mut. Ins. Co. v. Moody Station & Grocery*, 821 F.3d 973, 976-77 (8th Cir. 2016).

Each claimant bears the burden of proving its right to the interpleaded funds by a preponderance of the evidence. 7 Wright, Miller & Kane, *Federal Practice and Procedure* § 1714 (3d ed. 2001). *See General Elec. Capital Assurance v. Van Norman*, 209 F. Supp. 2d 668, 670 (S.D. Tex. 2002) (applying Texas law).[13]

Claims Included in Settlement Agreement and Release

Arkansas law governs the terms of the Settlement Agreement.[14]

Under Arkansas law, when contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to

---

[13] The parties agree that Texas law applies to this action.

[14] Stearns Trial Exh. 19 – Settlement Agreement & Release at para. 4 ("This Agreement is contractual and shall be governed by the laws of the State of Arkansas.").

construe the written agreement according to the plain meaning of the language employed. *Artman v. Hoy*, 257 S.W.3d 864, 869 (Ark. 2007); *C. & A. Constr. Co. v. Benning Constr. Co.*, 509 S.W.2d 302, 303 (Ark. 1974) (citing *Miller v. Dyer,* 423 S.W.2d 275 (Ark. 1968)). Courts will not go beyond the four corners of the instrument unless the language of the contract is uncertain, doubtful, or ambiguous. *Parham v. Worthen Bank & Trust Co.*, 933 S.W.2d 384, 387 (Ark. 1996). *See also Johnson v. Missouri Pac. R. Co.*, 214 S.W. 17, 19 (Ark. 1919) (contract to be read and considered from its four corners); *Stacy v. Williams*, 834 S.W.2d 156, 159 (Ark. Ct. App. 1992) (court looked to four corners of the agreement to discern intent). The determination of whether a contract is ambiguous is a question of law. *All-Ways Logistics, Inc. v. USA Truck, Inc.*, 583 F.3d 511, 516 (8th Cir. 2009) (applying Arkansas law).

The terms of the Settlement Agreement here are not ambiguous. The preamble of the Agreement refers specifically to the Bayer Suit, acknowledging the suit's claims against Bayer arising from Texana's "damages alleged to have been caused by the presence of Bayer GM Rice in the commercial rice supply[.]" Bayer and Texana express their mutual "desire to fully and finally resolve *said suit* and any claims that may be asserted against Bayer and that relate to or arise from the Claims." Such desire is achieved through the specific terms of the Agreement whereby, in exchange for $2,137,500, Texana agreed to release Bayer from "*any*

-11-

*and all claims, demands, causes of action*, liabilities, sums of money, *damages . . . costs and losses, of any type, kind, nature, description or character whatsoever*, whether based on tort, contract, or other theory of recovery . . . , *which Texana now has* or which may hereafter accrue *on account of or in any way growing or arising out of the presence in the United States rice supply of Bayer GM Rice Seed*[.]" When Bayer and Texana executed the Settlement Agreement in September 2012, Texana's claim for damage to its property, equipment, and machinery remained a live and pending claim in the Bayer Suit and thus fell within the parameters of "any and all claims . . . which Texana now has . . . on account of or in any way growing or arising out of the presence . . . of Bayer GM Rice Seed." When given their ordinary meaning, these terms create no uncertainty or doubt that Texana settled *all* of its claims against Bayer arising out of the GM Rice contamination, including its property damage claim.

Amegy Bank argues that the preamble to the Agreement refers only to Texana's claim for lost profits and thus that that was the only claim encompassed by the Settlement Agreement. Giving ordinary meaning to the language used in the release belies this contention. As set out above, the release language included any and all claims for damages that Texana then had against Bayer. While the Agreement could have restricted its applicability to only lost profits, it plainly did not. Instead, Texana's damages from lost profits were "include[ed] without

-12-

limitation" among the damages Texana claimed "in said suit" and later released under the terms of the Agreement. If I were to construe the Agreement as Amegy Bank urges, I would be creating a new contractual provision limiting the Agreement's application. This I cannot do. *Lee v. Bolan*, 374 S.W.3d 718, 726 (Ark. Ct. App. 2010) ("To have the court now make a new contractual provision, which could easily have been inserted at the time of contracting, is improper.").

Accordingly, all of Texana's claims against Bayer were included in the Settlement Agreement and Release, including its claim for damage to property, equipment, and machinery. This asserted claim was therefore included in the Bayer Settlement.

Stearns Bank's Security Interest

In order for a security interest in a commercial tort claim to attach, the claim must be in existence when the security agreement is authenticated – that is, the claim itself must be in existence at the time it is encumbered. *Bayer*, 837 F.3d at 915-16. Proceeds of a commercial tort claim that is not in existence at the time of encumbrance are therefore excluded from an after-acquired general intangible clause. *Id.* at 916.

When Stearns Bank perfected its interest on Texana's collateral in 2002, no commercial tort claim for Texana's lost contracts, profits, and goodwill was in existence. Such a claim did not accrue for Texana until 2006. Therefore, to the

extent the 2012 Bayer Settlement includes proceeds of Texana's commercial tort claim for lost contracts, profits, and goodwill, these proceeds are excluded from the general intangibles clause of Stearns Bank's 2002 security agreement. Consequently, Stearns Bank does not have an interest in that portion of the Bayer Settlement for damages to Texana's lost contracts, profits, and goodwill.

The original collateral securing Stearns Bank's 2002 security agreement included, *inter alia*, Texana's fixtures, equipment, and all proceeds from sums due from a third party who has damaged the collateral. When Bayer damaged this collateral in 2006, Stearns Bank's interest attached to the right of recovery for those damages. *Bayer*, 837 F.3d at 916. Accordingly, Stearns Bank has a priority interest in that portion of the Bayer Settlement that represents proceeds of its original collateral – that is, payment for damage to Texana's property, equipment, and machinery. *Id.* at 916-17. Stearns Bank's foreclosure did not discharge its otherwise valid security interest in the proceeds of this collateral. *Id.* at 915. Nor did it prevent Stearns Bank from pursuing its rights to such proceeds. *Id.*

Amegy Bank's Security Interest

When Amegy Bank perfected its security interest in Texana's commercial tort claim against Bayer in 2007, Texana's claim for lost contracts, profits, and goodwill was already in existence. Amegy Bank has an interest in this aspect of Texana's commercial tort claim and may therefore recover settlement monies for

-14-

Texana's lost contracts, profits, and goodwill. But because Stearns Bank's right of recovery for damage to the original collateral had already attached when Amegy Bank perfected its interest, Stearns Bank has priority as to that portion of the Bayer Settlement that constitutes proceeds of its original collateral. *Bayer*, 837 F.3d at 916-17.

Apportionment of Bayer Settlement

As set out above, evidence adduced at trial shows that Texana sustained damage to its property, plant, and equipment in the amount of $9,232,000. Texana sustained damage for lost contracts, future profits, and goodwill in the amount of $13,978,010. There is no proof that Texana sustained any other damage. Accordingly, Texana's total damages arising out of Bayer's conduct amount to $23,210,010.

The $9,232,000 in damages to Texana's property, plant, and equipment – that is, to Stearns Bank's original collateral – represent 39.78% of Texana's total damages. The $13,978,010 in damages for lost contracts, profits, and goodwill represent 60.22% of Texana's total damages. Accordingly, because the Bayer Settlement settled <u>all</u> claims, and damage to Texana's property, plant, and equipment made up 39.78% of Texana's total damages, I find that 39.78% of the Bayer Settlement constitutes proceeds of Stearns Bank's original collateral. Because Stearns Bank has a priority interest in that portion of the Bayer Settlement

-15-

that constitutes proceeds of its original collateral, I find that Stearns Bank is entitled to 39.78% of the Bayer Settlement.

Therefore, for all of the foregoing reasons, Stearns Bank is entitled to recover 39.78% of the $1,923,750 Bayer Settlement, that is, $765,267.75. I will therefore order the Clerk of Court to disburse $765,267.75 to Stearns Bank from the Court's registry. Amegy Bank shall recover the remainder of the Net Settlement in the Court's registry – that is, $212,002.15 – as and for its interest in the commercial tort claim for lost profits, contracts, and goodwill. I will therefore order the Clerk to disburse $212,002.15 to Amegy Bank from the Court's registry.

Because Stearns Bank's recovery of $765,267.75 represents 78.3% of the principal sum in the registry, I will order the Clerk to disburse to Stearns Bank 78.3% of the accrued interest, and to Amegy Bank 21.7% of the accrued interest, with such disbursements to occur after deduction of the Court's administrative fee.

An appropriate Judgment and Order of Disbursement is entered herewith.

*[Signature]*
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 19th day of March, 2018.